IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CELESTINO GUILLERMO, | ) | No. C 11-6231 JSW (PR) |
| | ) | |
| Petitioner, | ) | **ORDER DENYING PETITION FOR** |
| | ) | **WRIT OF HABEAS CORPUS AND** |
| vs. | ) | **CERTIFICATE OF APPEALABILITY** |
| | ) | |
| TERRI MCDONALD, Warden, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| _____ | ) | |

## INTRODUCTION

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254.  The Court ordered Respondent to show cause why the writ should not be granted.  Respondent filed an answer and a memorandum of points and authorities in support, and has lodged exhibits with the Court.  Petitioner responded with a traverse. For the reasons set out below, the petition is DENIED.

## PROCEDURAL BACKGROUND

In 2007, Petitioner was convicted in San Mateo County Superior Court of numerous counts of "rape in concert" (Cal . Pen. Code § 264.1).  The trial court sentenced him to a term of thirty-six years in state prison.  In 2010, the California Court

of Appeal affirmed the judgment in an unpublished opinion (Ex. L)[1] and the California Supreme Court subsequently denied a petition for review.  Petitioner's requests for state habeas relief were also denied.  The instant petition was filed on December 13, 2011.

## FACTUAL BACKGROUND

The California Court of Appeal summarized the factual background of this case as follows:

### II.  EVIDENCE AT TRIAL

**A.      Prosecution Evidence**

On the afternoon of May 28, 2005, Emily Doe went to the grocery store, which was about three miles away from her apartment in Fremont. Around 7:00 p.m., Emily was walking home with several bags of groceries, when [co-defendant] Flores and Petitioner drove up and asked her for directions to the mall. . . . After asking for directions, the men offered to give her a ride home.  However, they drove her to the mall instead of her apartment; Emily went into the mall with Flores and Petitioner.  Flores and Petitioner spoke to Emily in English, but spoke to each other in Spanish, most of which Emily could not understand.

After visiting the mall, Flores and Petitioner stopped at a gas station and asked Emily to buy alcohol for them.  Emily refused to buy the alcohol and asked them to drive her home, which they did.

Once at the apartment, Emily told Flores and Petitioner that she was going to a nearby dance club.  Flores and Petitioner offered to drive her to the club.  Emily changed her clothes.  Flores, Petitioner, and Emily left the apartment between 7:30 p.m. and 8:15 p.m.

Petitioner drove and Flores got into the back seat with Emily.  Emily gave directions to the club in English.  Initially, Petitioner complied with the directions.  However, instead of going to the club, Petitioner got onto Interstate 880 heading south.  When Emily told Petitioner to turn around, he continued to drive toward San Jose.  Flores and Petitioner spoke to each other in Spanish, which Emily could not understand.  When she asked why they were heading south, one of them responded in English that they had to pick up a friend.

They stopped at a Mexican restaurant in Milpitas or San Jose, where they met up with [co-defendant] Cardelas, who called himself Gary. Cardelas went back into the restaurant.  Flores, Petitioner, and Emily then

---

[1]Citations to "Ex." are to the record lodged with the Court by the Attorney General, except where otherwise noted.

2

went to a gas station, where Emily bought a six-pack of beer at Petitioner's and Flores's request.  They shared the six-pack while waiting to pick up Cardelas from work.  After finishing the beer, they returned to the restaurant to get Cardelas.

They then drove to Petitioner's house, where Petitioner retrieved a sweatshirt for Emily.  Next, they went to Cardelas's apartment in San Jose, where they ate food from the Mexican restaurant.  While at the apartment, Flores sat close to Emily, touched her on the arm and leg, and tried to kiss her.  She told him "no" three times, and pushed him away.

Next, they drove to another apartment and picked up [co-defendant] Resendiz, who was wearing a white hooded sweatshirt.  Resendiz got in the back seat with Emily.  They made another stop at a gas station and more beer was purchased.  When Emily stated several times that she wanted to go home, the men responded to her less and spoke to each other in Spanish.  When she became more upset and demanding about going home, Cardelas told her in English, "No, it is San Francisco or nothing."

Flores, however, drove to a beach in Half Moon Bay; they arrived at the beach close to midnight.  During the drive, all four men continued to speak to each other in Spanish, leaving Emily out of the conversation.  On the way to Half Moon Bay, Cardelas was trying to hug Emily.

Once at the beach, Emily started calling defendants liars and yelling at them to take her home.  Defendants responded by laughing at Emily and telling her to get out of the car.  Emily got out of the car and attempted to use one of the nearby portable toilets, but it was too dark to use it.  Flores walked her to a bridge and told her she could use the restroom on the other side.  Emily heard the voices of a man and a woman coming from the direction of the stairs to the beach.  When she tried to walk down the stairs, Flores directed her to the bridge and walked her across it.  Flores tried to watch Emily as she urinated behind a bush; she told him to go away, but he still tried to watch her.

When Emily finished urinating, Flores grabbed her all over her body and reached into her underwear, touching the inside of her vagina with his finger.  Emily tried to push him away, but he pulled her to the ground.  As Flores was on top of Emily, he continued to grab her all over her body.  When Emily slapped Flores, he got mad and started to loosen his belt buckle.  In a pleading voice, she said "No" and Flores stopped and got up.

As Emily and Flores started walking back across the bridge, Cardelas, Petitioner and Resendiz ran toward them, yelling and hollering.  All four men grabbed her, picked her up in the air, and stuck their fingers in her vagina as they put her down on the ground.  Emily struggled and kicked her legs.  Eventually, the men got control of her arms and legs.  As Emily was screaming, Resendiz covered her mouth and nose, suffocating her.  She stopped fighting and was raped several times.

Resendiz was the first one to rape Emily.  As he raped her, he

3

slapped her across the face.  Then Cardelas raped her while the other three men stood by.  Emily believed that if she tried to fight Cardelas, she would be beaten or killed.  Next, Petitioner raped her.  As Petitioner raped Emily, Resendiz "stomped" on her face with his foot, breaking a bone in her cheek.  After Petitioner raped her, Resendiz raped her again.  Flores beat Emily and held her down during the rapes.

Meanwhile, two college students, Alicia Riley and William Greene, had driven to the beach in Half Moon Bay; they arrived between 11:00 and 11:30 p.m.  They parked their car, walked down the stairs to the beach, and spread out a blanket on the sand.  No one else was on the beach.  After a while, Riley saw people at the top of the stairs.  One young Latino man, resembling Petitioner, came down to the beach.  He said something in English that Riley could not understand, so she spoke to him in Spanish. The man asked for a cigarette in Spanish; Riley responded that they did not have any cigarettes.  After an uncomfortable pause, the man slowly backed away; and while speaking English, he said in a flirtatious way, "hey[,] mamita, you are pretty."  Greene put his arm around Riley; the man then walked back up to the stairs to where the other people were standing. Riley and Greene were scared.  They stayed on the beach for a few minutes, then left.  When they got past the bridge, they heard punching sounds, a woman screaming, and a male voice saying "shut up, shut up." They went back to their car and called the police.

After the fourth rape, Petitioner held onto Emily's arm, as the other men surrounded her and led her on the path to the car.  Cardelas was smiling and waving Emily's underwear.  Then, Petitioner pulled Emily on top of him on the grass and touched her chest with his hands.  During this time, Petitioner encouraged Flores to rape her.  The left side of Emily's face was swelling up and she could taste blood.

Emily heard sirens; defendants said the cops were coming and they started to run to the car.  Resendiz did not run to the car, but ran away across the parking lot.  Flores drove the car to the start of the path.  As Cardelas took Emily to the car, he told her over and over again in English, "If you say anything, your life is over." Once Flores, Petitioner and Cardelas were in the car with Emily, a police car pulled up behind them. In the car, Cardelas repeatedly threatened Emily, telling her, "If you say anything, your life is over."

Sergeant Mark Reed, of the Half Moon Bay Police Department, approached the car.  Emily's hand was over her face.  She made eye contact with Sergeant Reed, moved her hand away to show the injury to her face, and nodded her head slightly.  Sergeant Reed nodded slightly and called for a cover unit.  Again, Cardelas threatened Emily's life.

After the cover unit arrived, Emily got out of the car and went to the side of the patrol car.  An ambulance arrived and took Emily to the hospital.  About an hour later, Resendiz walked up to the police officers and surrendered.

At the hospital, a CT scan of Emily's face revealed a fracture of her

4

left maxillary sinus.  The force that would be required to cause this type of injury varies, but it would be a "targeted" or specific blow that caused it.  Emily's face was bruised under both eyes.  Her lips were swollen, with a laceration on her lower lip and an abrasion on her upper lip.

Emily had swelling in her clitoral hood and labia majora, which indicated a "recent incident" or genital trauma.  She also had a small laceration on her perineum, which was caused by some sort of blunt force.

A search of the scene revealed one condom on the bridge, and one condom under it.  The DNA inside the condom found on the bridge was consistent with Resendiz's DNA.  The inside of the condom found under the bridge had a mixture of DNA, with the major non-sperm fraction being consistent with Flores.  Also, Resendiz and Emily could not be excluded as possible minor contributors of the non-sperm fractions of this DNA mixture.  Emily's DNA was on the outside of both condoms.

A sample DNA swabbing was taken from the outside of Cardelas's penis and scrotum.  The penile sample contained a non-sperm fraction that was consistent with Emily's DNA.  The scrotal sample contained a mixture of DNA from which Emily and Cardelas could not be excluded as contributors to the non-sperm fraction.

Resendiz's underwear was seized and analyzed.  The underwear had crotch stains, which contained sperm fractions consistent with Resendiz's DNA, and had mixtures of non-sperm fractions from which Resendiz and Emily could not be excluded as contributors.

Petitioner's shirt had a blood stain, with the major source of DNA being consistent with Emily, and the minor source being consistent with Petitioner.  The fly area of Petitioner's boxer shorts contained a sperm fraction matching his DNA.  The underwear also contained a mixture of non-sperm fraction, with the major contributor being Emily and the minor contributor being Petitioner.

**B.     Defense Evidence**

A forensic expert in blood analysis testified that when Petitioner's blood sample was drawn on May 29, 2005, at approximately 10:00 a.m., his blood alcohol level was .03 percent.  Alcohol is eliminated from the body at a rate of .02 per hour.  At that rate, Petitioner's blood alcohol level when he was taken into custody at about 2:00 a.m. would have been approximately .19 percent.  The other three defendants and Emily had blood alcohol levels of .00 percent at the time of their respective tests.
. . . .

Ex. L at 3-8.

1

**<u>STANDARD OF REVIEW</u>**

2      A district court may not grant a petition challenging a state conviction or sentence

3  on the basis of a claim that was reviewed on the merits in state court unless the state

4  court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or

5  involved an unreasonable application of, clearly established Federal law, as determined

6  by the Supreme Court of the United States; or (2) resulted in a decision that was based

7  on an unreasonable determination of the facts in light of the evidence presented in the

8  State court proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions

9  of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362,

10  407-409 (2000), while the second prong applies to decisions based on factual

11  determinations. *Miller-El v. Cockrell*,  537 U.S. 322, 340 (2003).

12      A state court decision is "contrary to" Supreme Court authority, that is, falls under

13  the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to

14  that reached by [the Supreme] Court on a question of law or if the state court decides a

15  case differently than [the Supreme] Court has on a set of materially indistinguishable

16  facts."  *Williams (Terry)*, 529 U.S. at 412-413.  A state court decision is an

17  "unreasonable application of" Supreme Court authority, falling under the second clause

18  of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme

19  Court's decisions but "unreasonably applies that principle to the facts of the prisoner's

20  case."  *Id.* at 413.  The federal court on habeas review may not issue the writ "simply

21  because that court concludes in its independent judgment that the relevant state-court

22  decision applied clearly established federal law erroneously or incorrectly."  *Id.* at 411.

23  Rather, the application must be "objectively unreasonable" to support granting the writ.

24  *Id.* at 409.  When there is no reasoned opinion from the highest state court to consider

25  the Petitioner's claims, the Court looks to the last reasoned state court opinion.  *See Ylst*

26  *v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072,

27

28

1 │ 1079, n. 2 (9th Cir. 2000).

2 │ ## DISCUSSION

3 │ Petitioner raises two claims in his Petition. Each claim will be considered below.

4 │ **I.** **Peremptory Challenge**

5 │ In his first claim, which was denied by the state courts, Petitioner contends that

6 │ the prosecutor at his trial made a race-based peremptory challenge of a prospective juror,

7 │ thus allegedly depriving petitioner of his constitutional right to a jury composed of a fair

8 │ cross-section of the community. This claim was rejected by the state court in a reasoned

9 │ opinion as follows:

10 │ **B.** ***Batson/Wheeler* Motion**

11 │ Defendants contend that the prosecutor's peremptory challenge of
12 │ an African-American juror denied their constitutional rights to trial by a
   │ jury drawn from a representative cross-section of the community.

13 │ *1. Background*

14 │ From the prospective jurors available to sit on the jury, the
15 │ prosecutor struck four African-American women. As to the first two
   │ African-American women, the trial court found no prima facie case had
16 │ been established. As to the remaining two African-American jurors, S.B.
   │ and L.B., the trial court accepted the prosecutor's reasons for striking these
17 │ jurors. The instant appeal is limited to the prosecutor's decision to strike
   │ L.B.

18 │ According to her juror questionnaire, L.B. was retired from her
19 │ employment at Bank of America, where she had worked for 32 years. By
   │ the time of her retirement, L.B. had risen to the level of a vice-president at
20 │ the bank. For the past 10 years, L.B. had worked as a program manager at
   │ Our Kids First, where she was in charge of operations and supervised the
21 │ after-school program and personnel. She was a college graduate with a
   │ degree in psychology; she also had training in business administration.
22 │ She was married with two adult children. L.B. had several friends
   │ employed in various law enforcement fields. Although neither L.B. nor
23 │ her immediate family had any personal involvement in the criminal justice
   │ system, her first cousins had been in prison. L.B. stated that she could be
24 │ fair, and that if defendants were guilty they needed to serve time. L.B. also
   │ stated that she "would need eviden[ce] to judge fairly."

25 │ During voir dire, L.B. was questioned briefly by the prosecutor.
26 │ L.B. indicated that she could sit through the trial in a healthy manner. She
   │ described Our Kids First as an after-school and summer-day-camp
27 │ program.

28 │

7

Later, Petitioner's trial counsel asked L.B. the following question: "Do you think it's conceivable or possible that a woman can make a false claim to having been raped?"  L.B. responded, "Yes[,]" and the trial court immediately told defense counsel that his time was up; L.B. was not asked any further questions.

On the next round of challenges, the prosecutor peremptorily challenged L.B.  Defense counsel jointly objected to the prosecutor's striking of L.B. pursuant to *Batson v. Kentucky* (1986) 476 U.S. 79 and *People v. Wheeler* (1978) 22 Cal. 3d 258.  In finding a prima facie case, the trial court explained its ruling as follows: "I'm going to find a prima facie case. [¶] However, I think we'd be in a [different situation] if [Petitioner's counsel] had not asked his last question, which was No. 1, directed to her when it should not have been because she was not among the most recent group.  And No. 2, did not give the D.A. a chance to rehabilitate since he was done with his time.   [¶] But I'm going to find a prima facie case."

In response, the prosecutor asserted the challenge was based on the fact that "[t]his juror is now entertaining the possibility of doubting Emily and that her claims are false."  The other thing that gave the prosecutor "cause for concern" was that L.B. has "first cousins, plural, that have served time in prison.  She also devotes her time to helping at-risk youth with [Our] Kids First."

In denying the *Batson/Wheeler* motion, the trial court explained that "the straw that broke the camel's back was that last question [Petitioner's counsel] asked.  I think that the way it was phrased and the way it was answered gave the prosecution a reason to believe that it was biased."  The trial court also found that the prosecutor's other reasons for excusing L.B. were valid.

### 2. ***Applicable Law***

The law applicable to *Batson/Wheeler* claims is well settled. "'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citation.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]'" (*People v. Davis* (2009) 45 Cal. 4th 539, 582.)

In this case, the trial court ruled that defendants made a prima facie showing; and then after hearing the prosecutor's reasons for the challenge, the court determined that there were valid reasons for excusing L.B.  Thus, this case is a third stage *Batson/Wheeler* inquiry.  "'[T]he critical question in determining whether [a party] has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike.' [Citation.] The credibility of a prosecutor's stated

8

reasons 'can be measured by, among other factors . . . how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.'" (*People v. Hamilton* (2009) 45 Cal. 4th 863, 900 (*Hamilton*).)  All relevant circumstances may be relied upon in determining whether there has been purposeful discrimination, including disparate treatment of similarly situated panelists. (*People v. Lenix* (2008) 44 Cal. 4th 602, 622 (*Lenix*).)  "If a prosecutor's proffered reason for striking a [B]lack panelist applies just as well to an otherwise-similar non[-B]lack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." (*Miller-El v. Dretke* (2005) 545 U.S. 231, 241.)  "Comparative juror analysis is evidence that, while subject to inherent limitations, must be considered when reviewing claims of error at *Wheeler/Batson's* third stage when the defendant relies on such evidence and the record is adequate to permit the comparisons." (*Lenix, supra* 44 Cal. 4th at p. 607.)

"The existence or nonexistence of purposeful racial discrimination is a question of fact. [Citation.] We review the decision of the trial court under the substantial evidence standard, according deference to the trial court's ruling when the court has made a sincere and reasoned effort to evaluate each of the stated reasons for a challenge to a particular juror. [Citations.] '[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine.' [Citation.]  'We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] . . . .'"

### 3.   Analysis

#### a.   Sufficiency of the Evidence

Substantial evidence supports the prosecutor's stated reasons for striking L.B., and the trial court reasonably concluded the reasons were race-neutral.  The prosecutor indicated that, in his view, L.B.'s answer to the question posed by Petitioner's counsel alone served as a valid race-neutral reason for excusing her because L.B. was "now entertaining the possibility of doubting Emily and that her claims are false."  Although L.B.'s answer to the question was a simple "Yes," the prosecutor evidently detected something in the way she answered the question.  In denying the motion, the trial court also perceived something about L.B.'s demeanor, expressly noting "the way" she answered the question.

" . . . . The importance of observation during voir dire extends to court and counsel alike.  During voir dire, the trial judge has had an opportunity to observe counsel's behavior as well as the demeanor of prospective jurors.  These observations inherently affect the trial court's ruling on a [*Batson]/Wheeler* motion." (*People v. King* (1987) 195 Cal. App. 3d 923, 932 (*King*).).

. . . .

9

Here, without having had the benefit of observing voir dire as the trial court did, we afford great deference to the trial court's determination that the prosecutor provided a valid race-neutral reason for excusing L.B. (*Lenix, supra*, 44 Cal. 4th at pp. 613-614.) The believability and credibility of Emily was crucial to this case. Under these circumstances, the prosecutor's concern that L.B. was "entertaining the possibility of doubting Emily and that her claims are false" was an entirely valid reason for peremptorily challenging L.B. (See *People v. Chambie* (1987) 189 Cal. App. 3d 149, 158-159 [prospective juror's statement that she thought there a great possibility that a woman might lie about being raped was proper consideration justifying peremptory challenge]; *King, supra*, 195 Cal. App. 3d at p. 933 [prosecution properly challenged older male juror who likely had traditional values and might consider that victim was "'asking'" to be raped].)

### b. Comparative Juror Analysis

For the first time on appeal, defendants attack the credibility of the prosecutor's stated reasons for excusing L.B. based on a comparative juror analysis of the non-African-Americans the prosecutor left on the jury. According to defendants, these non-African-American jurors had some of the same characteristics (i.e. relatives in prison, sympathy for children) of those cited by the prosecutor as reasons for excusing L.B., thus undermining the credibility of those reasons. Although we will address defendants' comparative juror analysis on the merits, we note they failed to offer any such argument in the trial court. We are thus left to speculate on a cold record as to what legitimate grounds, if any the prosecutor might have perceived for distinguishing among these assertedly similar prospective jurors.

. . . .

The comparative analysis offered by defendants does little to further their claims of racial bias. Defendants call attention to four jurors, Jurors Nos. 1, 7, and 10, and Alternate Juror No. 1, who each had relatives involved in the criminal justice system. Defendants further point out that Juror No. 10 also worked as a teacher's aide in a kindergarten class, making her "just as sympathetic to children as the prosecutor suspected [L.B.] would [have] be[en]."

However, unlike L.B., none of these jurors expressed any opinion regarding the possibility of a woman lying about being raped. Rather, it appears L.B. was the only juror who answered this question. Although advocates (and reviewing courts) do not evaluate panelists based on a single answer (*Lenix, supra*, 44 Cal. 4th at p. 631), due to the timing of the question, the prosecutor was unable to further question L.B. about her response, thereby denying him the opportunity to have greater confidence in the overall thinking of L.B. regarding the subject of a rape victim's credibility (see *ibid.*), which was a crucial issue in the instant case.

In sum, we conclude defendant's proposed comparisons do little to

demonstrate prosecutorial bias against African-American jurors.

### 4. Conclusion

We are satisfied that no *Batson/Wheeler* error occurred, and that the trial court fairly and correctly determined that the prosecutor had adequately rebutted defendants' prima facie case by demonstrating a convincing nonracial reason for exercising a peremptory challenge against L.B.

Ex. L at 12-18.

Petitioner cannot demonstrate that the state court's reasoned opinion was contrary to, or an unreasonable application of, clearly established state law. Nor can he demonstrate that the opinion was based on an unreasonable determination of the facts.

The first step in a *Batson* challenge requires the defendant to make a prima facie showing of discriminatory jury selection. *Batson*, 476 U.S. at 94, 96. A defendant may rely on "the totality of the relevant facts" concerning the prosecutor's conduct during the defendant's trial. *Id.* If the defendant successfully establishes a prima facie case, the burden shifts to the prosecution to come forward with a race-neutral explanation for each contested challenge. *Id.* at 97. This second step requires the prosecutor to provide "a clear and reasonably specific explanation of his legitimate reasons for exercising the challeng[e]." *Id.* at 98. In the final step, the trial court has "the duty to determine if the defendant has established purposeful discrimination." *Id.* at 98.

As required by *Batson*, and as the state court's opinion details, the prosecutor provided the trial court with various race-neutral explanations for striking L.B. after the trial court found that Petitioner had established a prima facie case. *See* Ex. L at 12-18. The Supreme Court has held that "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, 500 U.S. 352, 360 (1991). The second step of the *Batson* inquiry "does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). The prosecutor's stated explanations for striking L.B. included her

response to the question about whether a woman could make a false claim about being raped, the fact that she had relatives in prison, and her work with at-risk youth.   Ex. L at 13.

Following the prosecutor's proffered reasons for striking L.B., the trial court adhered to the final step of a *Batson* challenge and "critically evaluated" the prosecutor's explanations.  At this stage, "the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination."  *Purkett*, 514 U.S. at 768. Although the trial court is not required to agree with the prosecutor's stated race-neutral explanations to accept them, the court must evaluate "the persuasiveness of the justification."  *See id.*  The trial court and the California Court of Appeal found the prosecutor's reasons to be adequate, and ruled that he had not engaged in purposeful discrimination by striking L.B.  Ex. L at 16-18.

Petitioner's argument that the state court erred in its comparative juror analysis is also unavailing.  "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003).   In this case, however, as the state court's detailed discussion confirms, the record fails to provide clear and convincing evidence of disparate treatment of similarly-situated venire persons based on their race. *See* 28 U.S.C. § 2254(e)(1).   AEDPA requires this Court to presume that the state court's factual findings are correct.  *See* 28 U.S.C § 2254(e)(1).  Furthermore, the Court has reviewed the applicable record, and Petitioner is unable to demonstrate that the state court's factual findings were unreasonable.

Because Petitioner cannot demonstrate that the rejection of this claim by the state appellate court was either contrary to or an unreasonable application of, clearly established United States Supreme Court authority, this claim must be denied.

## II.      Sufficiency of the Evidence

In his second claim, which was denied by the state courts, Petitioner contends that there was insufficient evidence to support his conviction for four counts of rape in concert.   This claim was rejected by the state court in a reasoned opinion as follows:

### C.      Sufficiency of the Evidence (Petitioner)

Petitioner contends insufficient evidence supports the jury's verdict that he was guilty of four counts of rape in concert.   We reject this contention.

### 1.      Applicable Law and Standard of Review

Section 264.1 provides, in pertinent part, that "in any case in which the defendant , voluntarily acting in concert with another person, by force or violence and against the will of the victim, committed an act described in Section 261, 262, or 289, either personally or by aiding and abetting the other person, . . . [the defendant] shall suffer confinement in the state prison for five, seven, or nine years."

. . . .

When determining whether the evidence was sufficient to sustain a conviction, "our role on appeal is a limited one." (*People v. Ochoa* (1993) 6 Cal. 4th 1199, 1206.)  In reviewing the sufficiency of the evidence, we do not weigh the evidence or evaluate the credibility of witnesses. . . . Rather. "the test of whether evidence is sufficient to support a conviction is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.]"  (*People v. Holt* (1997) 15 Cal. 4th 619, 667.)  "We draw all reasonable inferences in support of the judgment."  (*People v. Wader* (1993) 5 Cal. 4th 610, 640.) Reversal is not warranted unless it appears that "'upon no hypothesis whatever is there sufficient evidence to support the [conviction].'"  (*People v. Bolin* (1998) 18 Cal. 4th 297, 331 (*Bolin*).)

### 2.      Analysis

Petitioner points out that Emily initially told the police she was unsure if Petitioner raped her.  However, at trial, she testified that she was certain that Petitioner was the third person who raped her.  He argues that the evidence shows that he may have been on the beach where the college students were during some period of time.  He further contests the DNA evidence against him, arguing that the testing was potentially contaminated because his boxer shorts were mixed with other clothing in a bag. Petitioner also points out that the evidence at trial showed that he was extremely intoxicated at the time of the incidents, which "obviously also had an effect on the specific intent necessary to support a conviction for

rape in concert under the aiding and abetting theory on which three of the [four] charges against [him] were based."

By these arguments, Petitioner implicitly seeks to reweigh the evidence and reevaluate witness credibility. However, such determinations are within the exclusive province of the fact finder, not the reviewing court. (*Young, supra* 34 Cal. 4th at p. 1181.) Emily testified that she was raped four times, sometimes while she was held down by one or more of the defendants and sometimes while defendants stood by ready to force her into submission if she resisted. As to Petitioner, Emily testified that he had put his penis in her vagina, and that as he was raping her Resendiz "stomped" on her face with his foot. Then, after the fourth rape, Petitioner pulled Emily on top of him and encouraged Flores to rape her. From this evidence a reasonable trier of fact could find each defendant guilty beyond a reasonable doubt by committing the act or by assisting others in its commission. (*Jones, supra,* 212 Cal. App. 3d at p. 969.)

To the extent that Petitioner argues that his intoxication negated the specific intent necessary to aid and abet the rapes committed by the other defendants, the jury was properly instructed with CALCRIM No. 3426, regarding the effect of voluntary intoxication on the requisite specific intent. This instruction was a correct statement of the law, and we presume the jury understood its role in evaluating the evidence of Petitioner's intoxication. [Citations omitted].

Viewed in the light most favorable to the judgment, the evidentiary record is sufficient to sustain Petitioner's convictions for rape in concert.

Ex. L at 18-20.

Petitioner cannot demonstrate that the state court's reasoned opinion was contrary to, or an unreasonable application of, clearly established state law. Nor can he demonstrate that the opinion was based on an unreasonable determination of the facts.

Demonstrating entitlement to habeas relief based on a claim of insufficient evidence requires a substantial showing. Because the Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged," *In re Winship*, 397 U.S. 358, 364 (1970), a state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt states a constitutional claim. *See Jackson v. Virginia*, 443 U.S. 307, 321-324 (1979).

14

The Supreme Court has emphasized, however, that "*Jackson* claims face a high bar in federal habeas proceedings . . ." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam) (finding that the 3rd Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find that the evidence was insufficient to support petitioner's conviction). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992); *see also Coleman*, 132 S. Ct. at 2065 ("the only question under *Jackson* is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality"). Rather, the federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Payne,* 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319). A due process violation may be found only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt. *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338. Furthermore, a federal habeas court "must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any [] conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. The court may not substitute its judgment for that of the jury, *see Coleman*, 132 S. Ct. at 2065, and under *Jackson*'s standard of review, a jury's credibility determinations are entitled to near-total deference. *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).

Here, as the state court reasonably found, a rational trier of fact could have found that Petitioner was guilty of four counts of rape in concert. *Payne,* 982 F.2d at 338. Petitioner was arrested at the scene; furthermore, the victim's testimony, presumably believed by the jury, established that Petitioner participated in the rapes. Additionally,

the physical evidence supported the victim's testimony.  Ex. L at 18-20.  Accordingly, this Court finds that, after "'viewing the evidence in the light most favorable to the prosecution,'" a rational trier of fact "'could have found the essential elements of the crime beyond a reasonable doubt.'"  *Payne,* 982 F.2d at 338 (quoting *Jackson,* 443 U.S. at 319).

Because Petitioner cannot demonstrate that the rejection of this claim by the state appellate court was either contrary to or an unreasonable application of, clearly established United States Supreme Court authority, this claim must be denied.

## **CONCLUSION**

For the foregoing reasons, the petition for writ of habeas corpus is DENIED.

A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel,* 529 U.S. 473, 484 (2000).

The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED:  March 20, 2013

_____
JEFFREY S. WHITE
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


CELESTINO GUILLERMO,

         Plaintiff,

  v.

TERRI MCDONALD et al,

         Defendant.

_____/

Case Number: CV11-06231 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on March 20, 2013, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Celestino Guillermo
F96691
High Desert State Prison
P.O. Box 3030
Susanville, CA 96127

Dated: March 20, 2013

*Jennifer Ottolini*

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk